# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

JUAN A. JIMENEZ,

              Petitioner,

vs.

RANDY BLADES,

              Respondent.

Case No. 1:15-cv-00484-CWD

**MEMORANDUM DECISION AND ORDER**

      On June 13, 2016, the Court re-opened Petitioner Juan A. Jimenez's stayed habeas corpus matter. (Dkt. 12.) Petitioner is proceeding on his Amended Petition. (Dkt. 13.) All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Dkt. 22.)

      Pending before the Court is Respondent's Motion for Partial Summary Dismissal of all but two of Petitioner's claim on grounds of procedural default. (Dkt. 25.) The Motion is fully briefed with the filing of the documents the Court is construing as Petitioner's Responses (Dkts. 25, 31, 34). Several preliminary motions are also pending. (Dkt. 34, 35.)

      The Court has taken judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v.*

*Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

The Court has concluded that the claims at issue are procedurally defaulted and that no adequate reason excuses their default. In considering whether adequate excuse exists, the Court has reviewed the merits of the remaining two claims that are not procedurally defaulted. Rather than require expenditure of any further taxpayer money on requiring an answer from Respondent and considering more briefing, the Court will also dispose of the remaining claims on the merits in this Order. Accordingly, for the reasons that follow, Petitioner's entire Petition for Writ of Habeas Corpus will be denied and dismissed with prejudice. A certificate of appealability will not issue.

## MOTION TO TAKE JUDICIAL NOTICE

Petitioner has filed a Motion to Take Judicial Notice. (Dkt. 34.) A court may take judicial notice of adjudicative facts that are not subject to a reasonable dispute. Fed. R. Evid. 201. When judicial notice has been taken of certain facts, the fact finder must accept the facts as conclusive. *Id*.

Petitioner asks the Court to take judicial notice of the law governing *Brady* claims. That subject is not the proper object of a judicial notice request because published court cases are not facts. The Court has considered whether *Brady v. Maryland* and its progeny

apply to Petitioner's case, however, which seems to be what Petitioner is asking. A *Brady* discussion is included below.

Petitioner desires that the Court take judicial notice that he is proceeding pro se. Again, this is not an adjudicative fact, but it is a circumstance that has been taken into consideration by the Court.

The remainder of Petitioner's motion focuses on contested facts and argument. The Court has taken judicial notice of the Affidavit of Xavier Manchuca because it is part of the state court record, but it cannot take judicial notice of Petitioner's argument that it was properly presented to the state courts. The Court cannot take judicial notice of Petitioner's assertion that he was prejudiced by the prosecutor's implication that the blood on Petitioner's shoes belonged to the victim, when, after trial, that was determined to be untrue; this assertion is more appropriately construed as argument, rather than the subject of judicial notice. (Dkt. 36.) Accordingly, the Motion for Judicial Notice (Dkt. 34) is moot in part and will be denied in part, but the Court will consider Petitioner's motion as supplemental argument in support of his Petition for Writ of Habeas Corpus.

## MOTION FOR APPOINTMENT OF COUNSEL

Petitioner has filed a Motion to Appoint Counsel. (Dkt. 37.) Petitioner seeks appointment of counsel, because he has no legal training or resources. There is no constitutional right to counsel in a habeas corpus action. *Coleman v. Thompson,* 501 U.S. 722, 755 (1991). A habeas petitioner has a right to counsel, as provided by rule, if counsel is necessary for effective discovery or if an evidentiary hearing is required in his

case. *See* Rules 6(a) & 8(c) of the Rules Governing Section 2254 Cases. In addition, the Court may exercise its discretion to appoint counsel for an indigent petitioner in any case where required by the interests of justice. 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B). Whether counsel should be appointed turns on a petitioner's ability to articulate his claims in light of the complexity of the legal issues and his likelihood of success on the merits. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).

After a review of the record, the Court concludes that appointing counsel for Petitioner is not necessary. Neither discovery nor an evidentiary hearing is required to adjudicate this matter. *See* Rules 6(a) & 8(c) of the Rules Governing Section 2254 Cases; 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B); *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983). In fact, the Court has determined that it would be a waste of public resources to appoint counsel based on the lack of merit of Petitioner's claims.

## REVIEW OF MOTION FOR PARTIAL SUMMARY DISMISSAL

**1.      Factual Background**

The Idaho Court of Appeals described the evidence presented at trial as follows:

The record reflects that Jimenez and his friend [Ruben Nungary] were driven to the convenience store by a female acquaintance, and Jimenez's friend went inside the store. Jimenez's friend returned to the car and asked Jimenez to go inside, and Jimenez and the friend went in the store. Inside, a verbal argument ensued between Jimenez and his friend on one side and the victim [Jay Curtis Voshall] and another individual on the other side. At some point, Jimenez's friend slapped the victim's face,[1] and the commotion drew the attention of customers in the store and the cashier. Moreover, the commotion and subsequent events were recorded by the store's surveillance cameras.

[1] Witnesses described a sound like slapping or smacking, which drew their attention to the scuffle. Regardless of how the victim was struck, the strike caused a bloody nose.

Within a matter of seconds, the situation escalated, and Jimenez, it appeared to the customers and cashier, shoved or pushed the victim. Jimenez and his friend exited the store, and the victim exclaimed that he had been stabbed or shanked. One of the customers read off the license plate of the car that Jimenez and his friend returned to. Another customer, who was outside the store, watched the car pull out of the store's parking lot and proceed down the street. This customer was also able to follow the vehicle for a time. The car carrying Jimenez was eventually pulled over, and Jimenez was arrested and transported to the Caldwell City Police Department. Although officers did not find a knife on Jimenez or in the car, an officer preparing to place Jimenez in the holding cell noticed that Jimenez's shoes had red stains on them. The next day, a Caldwell City Police Department detective followed the route of the car carrying Jimenez to search for a knife. Less than a quarter mile away from the convenience store, the detective located a folding knife alongside the roadway with red stains. Jimenez was charged with aggravated battery and the case proceeded to trial.

At trial, the State presented testimony from customers, the cashier, law enforcement, and a criminalist, and also played surveillance video clips to the jury. The criminalist testified that both the shoes and knife had human blood on them, but she did not identify whose blood it was. In closing argument, the prosecutor suggested that the blood on the shoes came from the victim. Defense counsel reiterated to the jury that there was no evidence as to the source of the blood.

(State's Lodging F-5, pp.1-2.)

This was a somewhat unusual trial for several reasons. Two key players were absent from trial. The victim, Voshall, did not testify at trial. Neither did Nungary, Petitioner's friend, who seemed to have started the fight by hitting Voshall, after which Petitioner "shoved" Voshall. Also unusual was the fact that the store's surveillance cameras had caught the incident on video from several angles. Thus, it was almost as if the jurors could witness the incident themselves by viewing the video.

All the witnesses at the convenience store testified that Petitioner "shoved" the victim with one hand, not two. (*See* State's Lodging A-2.) Petitioner testified that he shoved the victim "in the middle of the chest," but did not stab him. (*Id*., p. 470, 451.) On cross-examination, Petitioner acknowledged that a shove usually makes people fall backwards. (*Id*., p. 471.) In this instance, Petitioner admitted, the victim "double[d] over leaning over" when he was "shoved." (*Id*.)

Petitioner's defense at trial was that Nungary had punched and stabbed Voshall before Petitioner shoved Voshall. Petitioner theorized that the blood on the shoes could have come from Voshall's bloody nose.

In asserting that Nungary stabbed Voshall early in the confrontation, Petitioner relied on the testimony of one witness, Anna Lopez, who said that Voshall did not even realize he had been stabbed until his friend told him so. Her memory was different from that of two other eyewitnesses, Brad Watson and Kevin Trey Bailey, who both testified that, just after Petitioner pushed Voshall, Voshall doubled over and exclaimed that he had been stabbed or shanked.

Contrary to Petitioner's strategy of blaming Ruben Nungary, the prosecutor argued:

> Jay Curtis Voshall clearly having been socked in the nose by all accounts by most people, by the video, would appear to have been done by Ruben Nungary wearing a green shirt that said "Oregon" on it. Could the blood have come from here? How the heck did it get on Juan's shoes? When Juan walked past Jay Voshall, Voshall went like this, Juan went that way off to the side of him.

[Defendant suggests] [t]he notion that during the trauma or stress of the entire situation that Voshall could have been punched in the nose, simultaneously stabbed or shortly thereafter stabbed, presumably by Ruben Nungary…that it takes him moments to realize he has been stabbed. Jay Voshall bent over when Juan Jimenez walked past him and pushed him, when he stabbed him. And in short order he straightened up and he said either, "I've been shanked" or "I've been stabbed."

I have a hard time believing that the pain associated with the broken nose blocked the pain from the wound, … the gaping wound as testified by the EMT that's consistent with being made by a sharp object…. The bloody nose, according to the defense, overrode the gaping bloody wound. His actions don't suggest that because he bent over. He bent over, lifts his shirt, says, "I got shanked" or "I got stabbed," takes off his other shirt and puts pressure on it.

(State's Lodging A-3, p. p. 34-35.)

The jury found Petitioner guilty of aggravated battery. (*Id.*, p. 64.) He was sentenced to a term of nine years fixed with six years indeterminate. (*Id.*, pp. 104-05.)

After his conviction in 2008, Petitioner filed a direct appeal contending that the trial court abused its discretion by imposing an excessive sentence. (State's Lodging B-1.) The Idaho Court of Appeals affirmed the sentence, and the Idaho Supreme Court denied Petitioner's petition for review. (State's Lodgings B-4 through B-8.)

Petitioner next filed a pro se post-conviction relief petition. The state district court appointed counsel for Petitioner, who filed an amended petition for post-conviction relief and a motion for DNA testing. Petitioner insisted that the blood on his shoes was from an earlier fight with Xavier Machuca that same day, not from the victim. Petitioner asserted that he asked his trial counsel to ask Machuca to testify, but counsel never did so.

The motion for DNA testing was denied and the post-conviction petition was dismissed upon the State's motion. (State's Lodgings C-1 through C-5.) Petitioner filed a notice of appeal. (State's Lodging C-3, pp. 488-91.)

While the appeal of his first post-conviction matter was pending, Petitioner filed a successive post-conviction petition pro se. (State's Lodging E-1.) Petitioner produced an affidavit from Machuca confirming Petitioner's contentions and stating that Machuca was willing to participate in DNA testing. He also stated that he would have testified at Petitioner's trial that the blood on the shoes was his if he had been asked by Petitioner's counsel. (State's Lodging E-1, p. 103.) Petitioner also presented evidence arising from a related federal action using the Voshall stabbing as a predicate act to charge Petitioner with gang-related racketeering. In 2013, the United States Attorney General had asked the Federal Bureau of Investigation (FBI) to DNA-test the evidence from the Voshall stabbing. The FBI lab results confirmed that the blood on Petitioner's shoes was *not* the victim's. However, the testing indicated that Voshall's blood was inside Petitioner's pants pocket and on the discarded knife. (*Id*., pp. 105-110.)

Petitioner was appointed counsel, who filed an amended petition. The successive post-conviction action was dismissed as untimely. Thereafter, the two appeals were consolidated into one action. (State's Lodging F-4.) The Idaho Court of Appeals affirmed denial of post-conviction relief in both actions. (State's Lodging F-5.)

Petitioner's counsel chose two claims to raise in the petition for review before the Idaho Supreme Court. That petition was denied, and a remittitur was issued, concluding Petitioner's state court actions. (State's Lodgings F-6 to F-9.)

**2.      Petitioner's Claims and Summary Dismissal Briefing**

Petitioner brings the following claims in his Petition for Writ of Habeas Corpus:

1. <u>Ineffective assistance of trial counsel *before* trial</u>, including: (a)(i) failing to file pretrial motions to suppress, (ii) failing to subpoena alibi witnesses, and (iii) failing to listen to Petitioner's version of the facts; (b)(i) *failing to conduct DNA testing on Petitioner's shoes* (corresponding to a claim in the post-conviction petition for review), (ii) failing to investigate Xavier Machuca regarding blood on Petitioner's shoes, and (iii) failing to go to the scene of the crime and locate potential witnesses; (c) failing to investigate Voshall, who did not want to testify or cooperate; (d) failing "to get the video evidence from the prosecutor"; (e) moving to withdraw from Jimenez's case prior to trial; (f) agreeing to waive the preliminary hearing without knowing all of the evidence; and (g) failing to obtain a contact visit with Jimenez to allow review of the video surveillance and failing to prepare Jimenez to testify. (*See* Dkt. 13.)

2. <u>Ineffective assistance of trial counsel *during* trial</u>, including: (a) failing to object or attempt to exclude admission of the shoes during trial; (b) failing to give an explanation to the jury regarding how the blood got on the shoes; (c) failing to investigate an alibi defense or present any alibi witnesses to corroborate Petitioner's theory that the

blood on the shoes belonged to Machuca from a previous fight; and (d) failing to request a jury instruction on the lesser-included offense of battery.

3. <u>Other ineffective assistance of trial counsel claims</u>, including: (a) failing to retain an investigator; (b)(i) *failing to have DNA testing completed on the shoes so that a suppression motion could have been filed* (which corresponds to one of the claims presented in the post-conviction petition for review), (ii) failing to prevent the prosecutor from using the shoes as evidence against him, and (iii) failing to prevent the prosecutor from using argument surrounding the blood on the shoes in closing argument; and (c) failing to assert an alleged speedy trial violation.

4. <u>Trial court errors during post-conviction review and trial</u>, including: (a) the state district court applied the wrong standard on post-conviction review; (b) the state district court refused to accept Machuca's written statement during post-conviction proceedings; (c) the trial court failed to give an included offense instruction for battery; (d) the state district court erroneously concluded Petitioner's successive postconviction petition was untimely; and (e) the trial court second-guessed trial counsel's strategic and tactical decisions.

5. <u>Other trial court, prosecutor, and trial counsel errors</u>: (a) a Confrontation Clause violation because Voshall failed to testify at trial; and (b) insufficient evidence upon which to base the conviction.

Respondent seeks summary dismissal of all the claims in the Petition for Writ of Habeas Corpus on procedural default grounds, with the exception of Claims 1(b)(i) and 3(b)(i), which Respondent concedes are properly exhausted. (Dkt. 25.)

## 3.    Standard of Law

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). Rule 4 of the Rules Governing § 2254 Cases authorizes the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." The Court takes judicial notice of the records from Petitioner's state court proceedings lodged by the parties.

A habeas petitioner must exhaust his remedies in the state courts before a federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *Id.* at 845. Because the Idaho Supreme Court has the discretion to review decisions of the Idaho Court of Appeals, a petitioner whose appeal was heard by the Idaho Court of Appeals also must have presented all of his federal claims in a petition seeking review before the Idaho Supreme Court. *Id.* at 847. "Fair presentation"

requires description of both the operative facts and the legal theories upon which the federal claim is based. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

If a claim was not properly presented to the Idaho Supreme Court, it is considered "procedurally defaulted" on federal habeas corpus review. Procedurally defaulted claims include those within the following circumstances: (1) when a petitioner has completely failed to raise a claim before the Idaho courts; (2) when a petitioner has raised a claim, but has failed to fully and fairly present it as a *federal* claim to the Idaho courts; and (3) when the Idaho courts have rejected a claim on an adequate and independent state procedural ground. *Id.*; *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## 4.    Discussion

To show that his claims have been exhausted properly, Petitioner must demonstrate that he (1) presented each claim to the Idaho Court of Appeals in a manner that comports with state law procedural requirements, and then (2) presented each claim to the Idaho Supreme Court in a proper petition for review. Respondent makes a very simple procedural default argument that is supported by references to the state court record: Petitioner presented no cognizable federal habeas corpus claim to the Idaho Supreme Court. The Court's detailed review of the record supports Respondent's contention.

On direct appeal, Petitioner brought only a state law excessive sentence claim, and the Idaho appellate courts affirmed the sentence on state law grounds. (State's Lodging

B-1 to B-7.) This is not a cognizable habeas corpus claim, because it is not a federal claim. Therefore, while Petitioner properly raised this claim to the Idaho Supreme Court, it is of no help to his exhaustion argument on federal habeas corpus review.

In Petitioner's consolidated post-conviction review (State's Lodging C-1 through F-9), he raised several of his claims before the Idaho Court of Appeals, but in the petition for review of the Idaho Court of Appeals' decision, Petitioner raised only two claims: denial of his Motion for DNA testing during the first post-conviction case and ineffective assistance of trial counsel for failing to obtain DNA testing before trial. (State's Lodging F-7, pp.7-9.) These claims correspond to Claims 1(b)(i) and 3(b)(i) in the federal habeas corpus petition. All other claims are procedurally defaulted because they were not raised before the Idaho Supreme Court, and it is now too late to do so in a procedurally proper manner.

In his Response, Petitioner asserts that his "ineffective assistance of counsel claims were presented fully to the Idaho Courts and/or remedies exhausted at naseum [sic] and must be granted." (Dkt. 30, p. 1.) Petitioner offers no facts or argument to counter the state court record, which shows that only two of his habeas claims were presented to the Idaho Supreme Court. Accordingly, the Court concludes that all of Petitioner's claims are procedurally defaulted except for Claims 1(b)(i) and 3(b)(i).

**5.      Cause and Prejudice and Miscarriage of Justice**

Two exceptions are available to petitioners who have procedurally defaulted their claims. A procedurally defaulted claim can be heard in federal court if the petitioner

shows either that there was legitimate cause for the default and that prejudice resulted

from the default, or, alternatively, that the petitioner is actually innocent and a

miscarriage of justice would occur if the federal claim is not heard. *Murray v. Carrier*,

477 U.S. 478, 488 (1986).

### A. *Traditional* Coleman *Cause*

#### 1) Standard of Law

Ordinarily, to show "cause" for a procedural default, petitioner must prove that

some objective factor external to the defense impeded his or his counsel's efforts to

comply with the state procedural rule at issue. *Coleman v. Thompson*, 501 U.S. 722, 753

(1991). To show "prejudice," a petitioner must show "not merely that the errors [in his

proceeding] constituted a possibility of prejudice, but that they worked to his actual and

substantial disadvantage, infecting his entire [proceeding] with errors of constitutional

dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

#### 2) Discussion

Petitioner has not pointed to any facts that show a cause external to him and his

counsel was the reason he failed to raise his claims before the Idaho Supreme Court. No

such cause is evident from the Court's review of the record. Rather, it appears that

Petitioner's very experienced criminal defense counsel selected what she decided were

the strongest claims, rather than risk having them obscured amidst many weaker claims. [2]

(*See* State's Lodging F-7.)

---

[2] The *Strickland* principles also apply to determining ineffective assistance of appellate counsel claims. To show prejudice on appeal, a petitioner must show that his attorney failed to raise an issue

### B. Martinez *Cause*

#### 1) Standard of Law

A limited exception to the *Coleman* rule exists in *Martinez v. Ryan*, 566 U.S. 1 (2012). That case held that inadequate assistance of post-conviction review (PCR) counsel or lack of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. To show ineffective assistance of PCR counsel, Petitioner must show that the defaulted ineffective assistance of trial counsel claims are "substantial," meaning that the claims have "some merit." *Id.* at 14. To show that each claim is substantial, Petitioner must show that trial counsel performed deficiently, resulting in prejudice, defined as a reasonable probability of a different outcome at trial. *Id.*; *see Strickland v. Washington*, 466 U.S. 668, 695-96 (1984).

The *Martinez v. Ryan* exception applies only to defaulted claims of ineffective assistance of trial counsel; it has not been extended to other types of claims. *See Davila v. Davis*, 137 S. Ct. 2058 (2017) (holding that *Martinez* is not applicable to claims of

---

obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). "Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id.*, 463 U.S. at 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

ineffective assistance of direct appeal counsel); *Hunton v. Sinclair*, 732 F.3d 1124 (9th Cir. 2013) (holding that *Martinez* is not applicable to a defaulted *Brady* claim).

2)     <u>Discussion</u>

Petitioner has not made a *Martinez* argument. As noted, above, most of his claims were winnowed out by appellate counsel, so as to present the strongest claims in a concise manner before the Idaho Supreme Court. Even if appellate counsel was at fault, the *Martinez* exception would not aid Petitioner, because it does not apply to appellate proceedings, only initial post-conviction proceedings. Therefore, *Martinez* does not apply to excuse the default of Petitioner's ineffective assistance of trial counsel claims.

***C. Miscarriage of Justice***

1)     <u>Standard of Law</u>

If a petitioner cannot show cause and prejudice for a procedurally defaulted claim, he can still raise the claim if he demonstrates that the Court's failure to consider it will result in a "fundamental miscarriage of justice." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A miscarriage of justice means that a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To show a miscarriage of justice, Petitioner must make a colorable showing of factual innocence. *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

Where the petitioner pleaded guilty and did not have the evidence in his case evaluated by a jury, he must show that, based on all of the evidence, "it is more likely than not that no reasonable juror would have found Petitioner guilty." *Van Buskirk v.*

*Baldwin*, 265 F.3d 1080, 1084 (9th Cir. 2001), *citing Schlup v. Delo*, 513 U.S. 298, 327 (1995). Types of evidence "which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. at 331, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 351 (8th Cir. 1996).

The United States Court of Appeals for the Ninth Circuit has observed that, due to "the rarity of [new reliable evidence showing actual innocence], in virtually every case, the allegation of actual innocence has been summarily rejected." *Shumway v. Payne*, 223 F.3d 982, 990 (9th Cir. 2000) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

2) <u>Discussion</u>

Petitioner asserts that the jury "received only false assumptions of evidence regarding the blood of Mr. Voshall's being the blood on the Petitioner's/Defendant's shoes." (Dkt. 31, p. 2.) Petitioner asserts that "the prosecutor had a duty to dismiss and/or come forth with truth regarding the exculpatory evidence pursuant to said duty and *Brady* laws." (*Id*.) Petitioner cites *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny in support of his claim.

It is well established that the prosecution has a duty under the due process clause of the Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is

exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Petitioner's *Brady* argument fails because he knew about the evidence and had equal access to have it tested before trial. Neither party had the evidence DNA-tested before trial, but both preferred to litigate on assumption and inference instead of facts (a strategy); neither party knew whose blood was on the shoes and knife, and neither party had thought to have the pants tested at all. Evidence is not considered "withheld" by the prosecution if Defendant's counsel knew about it and could have requested testing.

Regardless, the factual foundation of Petitioner's *Brady* argument does not show that he is actually innocent. For an actual innocence assessment, the Court can consider all of the evidence that would now be placed before a new jury. Now, the jury would know that Voshall's blood was in Petitioner's pants pocket and on the knife, making the prosecution's case not just "overwhelming," as the Idaho Court of Appeals described it, but airtight. Another person's blood was on the shoes, but that is quite irrelevant— Petitioner has not explained how the unknown blood on the shoes would have had a bearing on having the victim's blood on his pants, nor how it would explain how the victim's blood got on the knife that had been discarded between the place of the crime and the place where Petitioner was confronted by police officers. Petitioner reasons: "The blood of Mr. Voshall[] on Defendant's pants pocket may be problematic for ineffective counsel, but with 'effective' counsel and/or strategy a verdict of not guilty can be

obtained." (*Id.*) However, Petitioner is silent on how any counsel could have gotten around evidence that the victim's blood was on the suspect's pants pocket, where the modus operandi was a pocket knife that was quickly slipped in and out of a pocket.

Petitioner's counsel, in fact, likely strategically chose *not* to have the blood tested, because that truly would have wrapped up Petitioner's guilt, not his innocence. Petitioner is being naïve in supposing that the lawyers and the laboratory scientists would not have scrutinized and tested the pants had the shoes and the knife been DNA-tested. It would have made no sense to omit testing the knife if the shoes were going to be tested. Once the knife showed Voshall's blood—the next step would have been to test the pants. For example, the prosecutor observed during closing: "No blood in Juan Jimenez's pants pocket. You know what, I don't think we ever heard testimony that somebody looked in his pants pocket." (State's Exhibit A-3.) Had the pants been DNA-tested, that evidence would have wrapped up the prosecution's case.

If Petitioner were to be tried again, evidence used in the federal criminal matter could be used to enlighten the strange and seemingly-disconnected facts in this case. Why did Nungary go back to the car to get Petitioner? Why did Nungary pick a fight with Voshall? Why would Petitioner shove an unknown person in a convenience store? The indictment in Case No. 1:11-cr-00068-EJL alleged that Petitioner and Nungary were members of the BMC Gang. Nungary went into the store and then came out to get Petitioner because he recognized Voshall as a member of the Northside gang. Both Petitioner and Nungary went into the store, not as regular consumers seeking to buy Corn

Nuts, as Petitioner asserts, but as BMC gang members looking to do what BMC gang members did—engage in violent acts against rival gangs. That is the reason Nungary punched Voshall and Petitioner stabbed him. (See Dkt. 1, p. 13 in that case.) That is more than likely the reason that Nungary and Voshall were absent from trial, because testifying against fellow or opposing gang members can have fatal consequences.

There is nothing in this record that shows Petitioner is factually innocent of aggravated battery. In fact, there is so much new evidence pointing to Petitioner as the perpetrator of the crime that, if Petitioner obtained habeas corpus relief in this action and was retried by the State (as one of its options after a grant of habeas corpus), the State would have an easier time convicting Petitioner than it did in 2008.

### 6. Noncognizable Claims

Each claim that challenges post-conviction or successive post-conviction issues is not a cognizable claim on federal habeas corpus review. It is well-settled that habeas corpus is not the proper avenue to address errors in a state's post-conviction review process. *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989), *cert. denied*, 493 U.S. 1012 (1989). In *Williams v. Missouri*, 640 F.2d 140 (8th Cir. 1981), the court explained:

> [I]nfirmities in the state's post conviction remedy procedure cannot serve as a basis for setting aside a valid original conviction [citation omitted].... There is no federal constitutional requirement that the state provide a means of post-conviction review of state convictions.... Errors or defects in the state post-conviction proceeding do not, ipso facto, render a prisoner's detention unlawful or raise constitutional questions cognizable in habeas corpus proceedings. Habeas corpus in the federal courts does not serve as an additional appeal from state court convictions. Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since [such a] claim ...

represents an attack on a proceeding collateral to detention of appellant and not on the detention itself.

*Id.* at 143-44.

Accordingly, Claims 4(a), (b), and (d) will be dismissed for failure to state a federal claim upon which relief can be granted.

**7.     Summary**

The Court agrees with Respondent that all the claims in the Petition for Writ of Habeas Corpus are procedurally defaulted. Petitioner has not shown that the cause and prejudice or the miscarriage of justice exceptions apply. The totality of the evidence strongly supports the guilty verdict, and, thus, Petitioner has not shown that he is actually innocent. Therefore, Petitioner may proceed to the merits of the two properly-exhausted claims.

## CONSIDERATION OF THE MERITS OF THE REMAINING CLAIMS

Two claims have been fully and properly exhausted in the state court system, and the Court will now consider the merits of those claims. The text of Rule 4 of the Rules Governing Habeas Corpus Cases under Section 2254 not only permits a district court to dismiss sua sponte an action in which "it plainly appears ... that the petitioner is not entitled to relief," *id.*, but directs it that it "must" dismiss the action, even in the absence of a responsive pleading from the state.

The Court clarifies that, while actual innocence and new evidence are a part of the analysis for procedural default, they are not a part of the analysis for constitutional violations occurring in conjunction with the original pre-trial, trial, and post-trial

proceedings. Rather, if a constitutional violation occurred, and the error was not harmless

or prejudice (as the particular test may be), the habeas corpus relief is warranted,

notwithstanding the guilt or innocence of the petitioner.

1. **Standard of Law**

Where the petitioner files a federal habeas corpus action to challenge a state court

judgment, Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C.§ 2254(d) limits relief to

instances where the state court's adjudication of the petitioner's claim:

1.    resulted in a decision that was contrary to, or involved an
       unreasonable application of, clearly established Federal law,
       as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in
       the state court proceeding.

28 U.S.C. § 2254(d).

Though the source of clearly established federal law must come only from the

holdings of the United States Supreme Court, circuit precedent may be persuasive

authority for determining whether a state court decision is an unreasonable application of

Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

However, circuit law may not be used "to refine or sharpen a general principle of

Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

To assess whether habeas corpus relief is warranted, the federal district court reviews "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 41 (2011). The deferential standard of section 2254(d) applies regardless of whether the state court decision "is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. When the last adjudication on the merits provides a reasoned opinion, federal courts evaluate the opinion as the grounds for denial. 28 U.S.C. 2254(d).

However, where the state's highest court did not issue a reasoned decision, courts within the Ninth Circuit review the decision of the Idaho Court of Appeals, using the "look through" principle of *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), and "presume the higher court agreed with and adopted the reasons given by the lower court." *Curiel v. Miller*, 830 F.3d 864 (9th Cir. 2016).[3]

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The standard for ineffective assistance of counsel claims was identified in *Strickland v. Washington*,

---

[3]  The United States Supreme Court recently clarified: "In *Ylst*, we said that where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits. 501 U.S., at 803, 111 S.Ct. 2590," but that the presumption can be refuted by "strong evidence." *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605–06 (2016).

466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show

that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the

defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must

establish both deficient performance and prejudice to prove an ineffective assistance of

counsel case. *Id.* at 697. On habeas review, the court may consider either prong of the

*Strickland* test first, or it may address both prongs, even if one is deficient and will

compel denial. *Id.*

Whether an attorney's performance was deficient is judged against an objective

standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the

"reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly
> deferential. It is all too tempting for a defendant to second-
> guess counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to
> conclude that a particular act or omission of counsel was
> unreasonable. A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that,
> under the circumstances, the challenged action might be
> considered sound trial strategy. There are countless ways to
> provide effective assistance in any given case. Even the best
> criminal defense attorneys would not defend a particular
> client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. Further, counsel is not deficient in an area where an investigation would not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the state court reasonably applied *Strickland. Duhaime*, 200 F.3d at 600. First, tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th

Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect it appears that better tactics were available, *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S. Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

That is, when evaluating a claim of ineffective assistance of counsel in a federal habeas proceeding under § 2254(d), the Court's review of that claim is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

## 2.    Decision of the Idaho Appellate Court

Claim 1(b)(i) is that Petitioner's counsel failed to conduct DNA testing on

Jimenez's shoes, and Claim 3(b)(i) is that Petitioner's counsel's failure led to his inability

to file a suppression motion to have the shoes excluded from the jury's consideration.

Because the Idaho Supreme Court did not issue a written decision but affirmed the Idaho

Court of Appeals' decision, this Court looks through to the Idaho Court of Appeals'

reasoning for rejecting Petitioner's claims. That court determined:

> [O]verwhelming circumstantial evidence from witnesses and
> from the surveillance video showed that Jimenez stabbed the
> victim. In spite of the overwhelming evidence of Jimenez's
> guilt, Jimenez maintains that he was prejudiced by defense
> counsel not requesting DNA testing because the prosecutor
> referenced the blood stains on top of Jimenez's shoes in
> closing argument. Even though the prosecutor may have
> implied that the shoes had blood on them from the victim,
> defense counsel reiterated to the jury that the source of the
> blood was unknown. But even accounting for the fact that the
> prosecutor would not have been able to imply that the blood
> on the shoes was from the victim, Jimenez has not made a
> prima facie showing of a reasonable probability that the
> outcome of the trial would have been different had defense
> counsel requested DNA testing.

Even cumulating the errors that Jimenez had pointed out, the Idaho

Court of Appeals still concluded:

> [E]ven if defense counsel had requested DNA testing of
> Jimenez's shoes, had investigated the third party, and had
> objected to the admission of Jimenez's shoes into evidence,
> Jimenez has not made a prima facie showing of a reasonable
> probability that the outcome of the trial would have been
> different.

*Jimenez v. State*, No. 40109, 2015 WL 3765355, at *7, 9 (Idaho Ct. App. June 17, 2015) (unpublished).

### 3. Discussion of Claims 1(b)(i) and 3(b)(i)

The Idaho Court of Appeals considered Petitioner's "best case scenario"—that trial counsel would have been able to have the shoes excluded as evidence because the human blood on the shoes was not the victim's. How would the omission of the shoes have impacted the remainder of the prosecution's case against Petitioner? The Court agrees that, because the video evidence very strongly pointed to Petitioner, omission of the shoes would not have made a difference in the outcome of the case.

The evidence supports the following conclusions and inferences. It is evident that Nungary punched Voshall with enough force to knock him off balance and bloody his nose. There is virtually no point in time when Nungary would have had the opportunity to stab Voshall. It was only when Petitioner walked by Voshall and "shoved" him with one hand to the chest that Voshall's body reacted as if it had been stabbed, and he immediately cried out that he had been stabbed. Even though the prosecutor's suggestion that Petitioner had blood on his shoes supported the prosecution's case, the video imagery of Voshall doubling over when Petitioner passed him was nearly definitive evidence that proved the prosecution's case. Whether or not the shoes were introduced to the jury had no impact on the strength of the video evidence.

Petitioner wanted his counsel to call Machuca as a witness, who had fought with Petitioner earlier that day, to testify that Machuca had been bloodied and *his* blood had

fallen upon Petitioner's shoes. Good strategy? Not necessarily so. First, the fact that Petitioner *already* had been in a fight in which the blood of his opponent was drawn earlier that same day is *not* a flattering a piece of evidence. Second, the prosecution generally cannot use other bad acts to show that a defendant was more likely to commit the bad act at issue, but, in this case, Petitioner would have opened the door for the prosecutor to suggest or imply that Petitioner had the propensity to draw blood a second time that same day. Third, even without a suggestion from the prosecution, jurors likely would have inferred that, because Petitioner drew Machuca's blood, he likely drew Voshall's blood. This Court does not agree with Petitioner that Machuca would have been a helpful witness. Even though Petitioner "gave [counsel] [his] version of facts that [Machuca] and [Petitioner] got into a fight and the blood on [his] shoes was [Machuca's]," strategically, it actually does make sense that "[counsel] ignored [his] request and kept offering [him] plea-deals." (Dkt. 3, p. 6.)

Did trial counsel prejudice Petitioner's defense by not having the shoes DNA-tested and suppressed as evidence? No, because the video was extraordinarily strong evidence from which the jury could infer that Voshall was not stabbed until Petitioner walked past him, regardless of the shoe evidence. Two of three eyewitnesses' testimony that Voshall stated, "I've been stabbed (or shanked)" directly after Petitioner touched him, correlate strongly with the video. Although the third eyewitness's testimony corroborated Petitioner's version of the events, the jury had to discard either her testimony or the other two witnesses' testimony. Obviously, the third witness's testimony

was discounted, because the victim's body showed an immediate reaction to the stabbing regardless of who said what when.

This is *not* a case in which the jury had to rely solely on what eyewitnesses thought they remembered seeing and hearing (no eyewitness is ever 100% accurate on all the details of an event, especially when that event is a shocking crime like a stabbing). It is almost as if the jurors witnessed the crime themselves via the video footage. Human physiology and experience support the inference that Voshall was not stabbed until Petitioner had contact with him, as the video demonstrates. Under the doubly-deferential standard of § 2254, a "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. Moreover, from this Court's view of the record, the Idaho Court of Appeals' decision was neither erroneous nor unreasonable, but sound and reasonable, without any consideration of the after-acquired evidence that shows the victim's blood was in Petitioner's pants pocket. Accordingly, habeas corpus relief is not warranted.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Judicial Notice (Dkt. 34) is DENIED, but the Court has considered Petitioner's Motion as supplemental argument in support of his Petition for Writ of Habeas Corpus.

2. Petitioner's Motion for Appointment of Counsel (Dkt. 35) is DENIED.

3. Respondent's Motion for Partial Summary Dismissal (Dkt. 25) is GRANTED as to all claims except 1(b)(i) and 3(b)(i), which were not included in the Motion.

4. Claim 1(b)(i) and 3(b)(i) are DISMISSED on the merits, and the entire Petition is dismissed with prejudice.

5. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: December 14, 2018

Honorable Candy W. Dale
United States Magistrate Judge